# United States Court of Appeals
## For the First Circuit

No. 14-2319

UNITED STATES OF AMERICA,

Appellee,

v.

VERISSIMO TAVARES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Thompson, Selya and Kayatta,
Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, with whom Federal Public Defender Office was on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

December 1, 2016

**KAYATTA**, **Circuit Judge**. Convicted of being a felon in possession of a firearm, Verissimo Tavares appeals both the conviction and his sentence. He claims that the district court erred in admitting improper and prejudicial expert testimony concerning the absence of fingerprints on the gun that the jury found Tavares to have possessed. He also claims that the district court erred in its guideline sentencing calculations by treating his convictions for resisting arrest and assault and battery with a dangerous weapon as "crime[s] of violence." For the following reasons, we affirm the conviction but remand for reconsideration of the sentence.

## I. BACKGROUND

Before dawn on August 4, 2013, two Boston police officers responded to a dispatch about a disturbance in a Boston neighborhood. As the officers dispersed the crowd, they heard gunshots emanating from the next street; when they went to investigate the source, they caught sight of a figure, subsequently revealed to be Tavares, riding away on a motor scooter. A chase ensued.

One of the pursuing police officers testified that he saw an object in Tavares's hands. Another testified that he saw Tavares throw an object into the yard of a nearby dwelling at 71 Clarkson Street. The chase ended when the police took Tavares into custody. Searching for the hurled object, one of the officers

discovered a silver handgun in the yard of 71 Clarkson Street. Detectives were summoned to examine the firearm. They determined that the handgun was a semiautomatic firearm, loaded with five rounds of ammunition.

A federal grand jury charged Tavares as a felon in possession of a firearm. See 18 U.S.C. § 922(g)(1). He maintained his innocence, and the case went to trial. During the government's case in chief, several police officers testified about the chase, the arrest, and the retrieval of the firearm. The government also presented the testimony of Richard Auclair, a fingerprint expert who held the position of Criminalist II in the Latent Print Unit (the Unit) at the Boston Police Department. The defense rested without presenting any evidence. The jury found Tavares guilty.

In anticipation of sentencing, the probation department prepared a presentence investigation report (the PSR). The Report recommended that the district court apply a four-level career offender enhancement under the sentencing guidelines, see U.S.S.G. § 2K2.1(a)(2), based on a conclusion that Tavares's prior Massachusetts convictions for resisting arrest, see Mass. Gen. Laws ch. 268, § 32B(a), and for assault and battery with a dangerous weapon (ABDW), see id. ch. 265, § 15A(b), were both "crime[s] of violence." Tavares objected to the classification of his putative predicate offenses as crimes of violence under the residual clause of the sentencing guidelines' career offender

provision. See U.S.S.G. § 4B1.2(a)(2) (Nov. 2014 ed.); id. at § 2K2.1(a)(2), cmt. n.1. Relying on our decisions in United States v. Glover, 558 F.3d 71, 80-81 (1st Cir. 2009), and United States v. Almenas, 553 F.3d 27, 33-34 (1st Cir. 2009), the district court overruled this objection. In so doing, the district court deemed both prior convictions to be for crimes of violence under the residual clause. The career offender enhancement, coupled with other adjustments not now in issue, yielded an advisory guideline range of 120-150 months, necessarily capped at 120 months by the ten year maximum applicable to the statute of conviction. See 18 U.S.C. § 924(a)(2). Using the advisory guideline range as a "place to start" and mulling the factors enumerated in 18 U.S.C. § 3553(a), the court imposed an 84-month prison term. This timely appeal followed.

## II. ANALYSIS

Challenging his conviction, Tavares argues that the district court erred, to his prejudice, by admitting over his objection a portion of Auclair's expert testimony. Alternatively, he argues that the district court erred in calculating his guideline sentencing range by counting his prior convictions as convictions for crimes of violence. We address each argument in turn.

## A. Expert Testimony

The principal issue at trial was whether Tavares had possessed the gun that the police found in the yard at 71 Clarkson Street. Mainly through cross-examination and argument, Tavares sought to show that the government had not proved his possession of the weapon beyond a reasonable doubt. To bolster this claim, he suggested (among other things) that the police officers' testimony about his involvement with the weapon was inconsistent; that the weapon, when found, did not bear his fingerprints and, thus, had not been in his hands; and that the police had rushed to judgment. The government countered, in part, by presenting Auclair's testimony.

After being duly qualified as a criminalist, Auclair testified about the significance of the fact that the examination of the gun by the police laboratory revealed only a very partial print that was itself insufficient to implicate or exclude Tavares. Auclair delineated the factors that affect recovery of usable prints (including the quality of ridge skin, the texture of the surface involved, the nature of print deposition, the treatment of the surface after print deposition, and environmental conditions).[1] After explaining the procedures used by the Unit to preserve

---

[1] In the context of fingerprint examination, "deposition" is the act of depositing something (such as sand, snow, or mud) on a surface, especially over a period of time.

prints, Auclair testified that the firearm removed from the yard at 71 Clarkson Street did not reveal any usable prints.

So far, so good.  During direct examination, however, the prosecutor asked Auclair about the percentage of cases in which usable prints were recovered from examined firearms, that is, what percentage of examined guns were found to contain fingerprints with sufficient ridge detail to allow the authorities to make an identification.  Over the defendant's objection, the court allowed Auclair to opine, based primarily on the Unit's experience over a period of nearly nine years, that usable prints had been recovered from approximately 16% of firearms examined.  Under cross-examination, Auclair explained that his opinion derived in part from a compilation of the Unit's fingerprint analyses completed by an intern:  we say "completed" because the Unit regularly kept such data on a series of spreadsheets, and the intern had simply updated those data and tabulated them.  Auclair could not say, however, either what procedures were used in the process of compilation or what oversight of the intern was provided by Unit staff.  He could opine, however, that the 16% figure was generally consistent with his own personal experience in examining hundreds of guns.  After cross-examination, Tavares moved to strike Auclair's opinion.  The court denied his motion.

On appeal, Tavares challenges the court's rulings admitting and refusing to strike this portion of Auclair's

testimony.  Specifically, Tavares argues, first, that the testimony lacked a proper foundation; and second, that the testimony was both not relevant and unfairly prejudicial.

We review a trial court's decision to admit or exclude evidence for abuse of discretion.  See United States v. Pires, 642 F.3d 1, 10 (1st Cir. 2011); United States v. Stierhoff, 549 F.3d 19, 27 (1st Cir. 2008).  In carrying out this task, we afford "broad deference to the determination made by the district court as to the reliability and relevance of expert testimony." Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006).  Absent a material error of law, we will not upset such a determination unless it appears that the district court "committed a meaningful error in judgment."  Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 83 (1st Cir. 1998) (quoting Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)).

Against this backdrop, we turn first to Tavares's argument that the challenged testimony lacked a sufficient foundation.  The touchstone for the admission of expert testimony in federal court litigation is Federal Rule of Evidence 702.  The rule provides in relevant part that, as a precursor to giving expert testimony, an expert must be "qualified . . . by knowledge, skill, experience, training, or education" and must possess specialized knowledge that "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R.

Evid. 702.  The rule further demands that such opinion testimony rest on "sufficient facts or data."  Id.

These requirements obligate a trial court to act as a gatekeeper in order to ensure, as a condition of admissibility, that proffered expert testimony rests on a sufficiently trustworthy foundation.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).  Where, as here, the factual basis of an expert's testimony is called into question, the district court must determine whether the testimony has "a reliable basis" in light of the knowledge and experience of the relevant discipline.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999) (quoting Daubert, 509 U.S. at 592).  We, in turn, review such determinations for abuse of discretion.  See id. at 142.

Tavares does not question Auclair's credentials as a fingerprint expert.  Nor could he:  Auclair earned a master's degree in forensics, underwent additional training upon joining the Unit, worked in the field for several years, and passed a series of annual proficiency tests.

Expert testimony, however, can for the most part be no better than the information provided to the expert.  That principle is summed up in the familiar phrase "garbage in, garbage out." Tavares says that, whatever Auclair's qualifications, he lacked a sufficiently reliable basis for offering an opinion about the rate at which usable fingerprints appear on examined firearms.

This aspect of Tavares's challenge focuses on the alleged inadequacies of the compilation of data upon which Auclair drew in reaching his opinion about the 16% rate of usable prints recovered from examined firearms. The last step in that compilation was taken by an intern (not working under Auclair's supervision), and Auclair did not profess to know what procedures the intern had followed in compiling and tabulating the data.

Although Auclair was not aware of the specific procedures used to compile and tabulate the data that went into the intern's report, he made clear that the report was neither an ad hoc nor an informal production. Rather, the report was the latest iteration in ordinary course of a type of statistical compilation that the Unit had periodically produced on earlier occasions. These past reports were kept by the Unit in the ordinary course of its operations and were based on data that the Unit had collected and maintained in spreadsheets over a number of years. These spreadsheets had been prepared by Unit staff (including individuals with responsibility for technical information within the Unit). The district court did not abuse its discretion in finding that Auclair, given his position and expertise, was entitled to rely on these spreadsheets. See United States v. Corey, 207 F.3d 84, 89 (1st Cir. 2000) (approving expert's reliance on "materials maintained at ATF 'research libraries,' which contained information on approximately five

thousand different firearms"); cf. United States v. Smith, 566 F.3d 410, 412 (4th Cir. 2009) (upholding admission of ATF agent's testimony that relied on "an ATF computerized database that had been compiled 'over many, many years as agents have done this practice'" in response to a challenge under the best evidence rule); Clausen v. M/V New Carissa, 339 F.3d 1049, 1059-61 (9th Cir. 2003) (upholding expert testimony that relied on history and reports created by others, even where there was no supported peer-reviewed literature). The intern's report merely updated these spreadsheets and tabulated the results, and it was within the court's discretion to find that Auclair could reasonably rely on that report as well.

What is more, Auclair testified that the percentage identified in the report for the Unit as a whole was "generally consistent" with his own long experience and that the scientific publications he had consulted did not affect this assessment. This testimony provided a basis for concluding that the department's report was materially reliable. It also provided an independent basis for the basic point being made: it was by no means unusual to find no usable prints on a gun. On that point, it could have hardly made any difference whether the percentage of guns found to have usable prints was exactly 16% or "generally" 16%. All in all, we think that it was within the district court's discretion

to accept Auclair's determination that the updated Unit statistics were reliable.

We likewise reject the defendant's related argument that Auclair's testimony lacked a proper foundation because he had not performed or supervised the work that produced the compilation. An expert may rely on information not itself admitted into evidence when forming an opinion. See Jones ex rel. United States v. Mass. Gen. Hosp., 780 F.3d 479, 494 n.8 (1st Cir. 2015). So, too, an expert may rely on information that is not independently admissible. See Corey, 207 F.3d at 89. Nor is there any requirement that the information relied on by an expert must have been compiled by him or under his supervision. See Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007). And though "the entirety of [an expert's] testimony cannot be the mere repetition of 'the out-of-court statements of others,'" United States v. Luna, 649 F.3d 91, 105 (1st Cir. 2011) (quoting United States v. Cormier, 468 F.3d 63, 73 (1st Cir. 2006)), that was not the case here: Auclair's reliance on the compilation represented only a small fraction of his testimony on the subject of unusable prints and was corroborated by his familiarity with past calculations by the Unit and his own experience.

Tavares's embrace of our decision in United States v. Giambro, 544 F.3d 26 (1st Cir. 2008), does not advance his cause. There, the trial court found that the basis for the expert's

testimony was "purely anecdotal," and was otherwise unreliable. Id. at 33. Our affirmance of that finding as not an abuse of discretion simply does not mean that it was an abuse of discretion to admit Auclair's testimony that rested in its material force on several independent, non-anecdotal grounds.

To say more on this point would be to paint the lily. In the circumstances here, we think that any question about the factual underpinnings of Auclair's opinion goes to its weight, not to its admissibility. See Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 22 (1st Cir. 2011). So, too, deciding whether the data were of a type that Auclair could reasonably rely upon under Federal Rule of Civil Procedure 703 was well within the trial court's discretion. See Corey, 207 F.3d at 92.

The defendant's challenge to the relevance of Auclair's testimony is equally unavailing. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. In this instance, we think that evidence reflecting the overall rate at which usable fingerprints are recovered from firearms was plainly relevant and likely helpful to the jury in determining what significance, if any, should be accorded to the absence of fingerprints on the firearm found at 71 Clarkson Street. Surely, such evidence had a tendency to make a fact of consequence more probable: it suggested

that the absence of usable prints did not mean, ipso facto, that the weapon was never in the defendant's hands, or that the police work was shoddy. See, e.g., United States v. Burdeau, 168 F.3d 352, 356-57 (9th Cir. 1999). Seen in this light, the evidence "assisted the jury in understanding that . . . certain objects are not particularly conducive to finding prints." United States v. Glover, 479 F.3d 511, 518 (7th Cir. 2007). Absent Auclair's testimony, "the jury may not have understood how [the defendant] could have possessed the weapon without leaving prints." Id.

In an effort to deflect the force of this reasoning, Tavares points out that the 16% figure did not distinguish between firearms that were subjected to the so-called "fuming" process before they were sent to the lab (like the firearm in this case) and those that were not.[2] This omission, Tavares submits, rendered the testimony too general to be relevant.

This argument is futile. There is simply no requirement that statistics must in all instances separately account for every potentially significant variable in order even to be relevant. See Morgan v. United Parcel Serv. of Am., Inc., 380 F.3d 459, 468-69 (8th Cir. 2004). That is true of the "fuming" variable here.

---

[2] As explained by Auclair, "fuming" is the process in which a firearm is placed in a chamber filled with a heated glue substance. The glue then adheres to the moisture in the fingerprint, hardens the moisture, and turns the fingerprint white, rendering the print visible and less likely to be rubbed away.

The defendant had the right--which he exercised--to cross-examine Auclair about the chances that the recovery percentage might differ materially in cases in which fuming was performed earlier. No more was exigible: after all, district courts have "broad latitude . . . with respect to the determination of the admissibility of expert testimony," Crowe, 506 F.3d at 18--and the limits of that broad discretion were not exceeded here.

Tavares has a fallback position. He contends that the challenged testimony, even if relevant, ought to have been excluded under Federal Rule of Evidence 403. Rule 403 provides, in pertinent part, that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury," or the like. Fed. R. Evid. 403. The rule is addressed to the district court's informed discretion and its due administration recognizes that "[t]his balancing is best performed by the trial judge, who has an intimate familiarity with the ebb and flow of the case and with its nuances." United States v. Raymond, 697 F.3d 32, 38 (1st Cir. 2012). "[O]nly rarely--and in extraordinarily compelling circumstances--will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Id. (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)).

Under this generous prescription, the district court's admission of the challenged testimony cannot be faulted. As we have already explained, the evidence was plainly relevant. Tavares, in turn, points to no prejudice that was so substantial as to compel exclusion. To be sure, Auclair's opinion was prejudicial in the sense that it aided the government's theory of the case and diminished the force of Tavares's theory of the case. But Rule 403 guards only against unfair prejudice, see United States v. Benedetti, 433 F.3d 111, 118 (1st Cir. 2005), and the probative value of this evidence, though modest, was not substantially outweighed by any unfairly prejudicial effect. Hence, there was no abuse of discretion in admitting that evidence.

## B. Classification of Prior Offenses as "Crimes of Violence"

Under § 2K2.1(a) of the United States Sentencing Guidelines, Tavares's prior criminal record played a substantial role in setting his base offense level and Guidelines sentencing range. Pursuant to § 2K2.1(a)(4), his base offense level increased from 12 to 20, and--in Tavares's case--his sentencing range increased from 37-46 months to 84-105 months, if he committed the subject offense "subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(4)(A). Under § 2K2.1(a)(2), his base offense level increased by an additional four levels, and--in Tavares's case--his sentencing range increased from 84-105 months to 120-

150 months, if he committed the subject offense subsequent to sustaining two such convictions.[3]

Over Tavares's objection, the district court found that both of these enhancements were proper and assigned Tavares a base offense level of 24 under these provisions. The court also adopted the PSR's two-level enhancement because the firearm had been stolen, U.S.S.G. § 2K2.1(b)(4)(A), resulting in a total offense level of 26. In adopting the base offense level of 24, the district court relied on the fact that Tavares had previously been convicted of two offenses in Massachusetts state court: Resisting Arrest and Assault and Battery with a Dangerous Weapon ("ABDW"). The parties agree that neither offense is a controlled substance offense. We must therefore determine whether the district court properly categorized each of these state court offenses as a "crime of violence" under the Guidelines. See U.S.S.G. § 4B1.2(a); see also id. § 2K2.1, cmt. n.1 (adopting definition of "crime of violence" in § 4B1.2(a)).

As relevant here, at the time of Tavares's sentencing, the term "crime of violence" was defined as

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that--

---

[3] Effectively, the actual sentencing range can only increase to 120 months because his conviction under 18 U.S.C. § 922(g)(1) carries a maximum term of imprisonment of ten years.

> (1) has as an element the use, attempted use,
> or threatened use of physical force
> against the person of another, or
>
> (2) is burglary of a dwelling, arson, or
> extortion, involves use of explosives, or
> otherwise involves conduct that presents
> a serious potential risk of physical
> injury to another.

U.S.S.G. § 4B1.2(a) (as amended Nov. 1, 2009).[4] Neither party maintains that Tavares's Resisting Arrest and ABDW offenses fall within any of the enumerated crimes of subsection (2). The parties further agree that Johnson v. United States (Johnson II), 135 S. Ct. 2551 (2015), should lead us to deem unconstitutionally vague the final clause of subsection (2) (commonly referred to as the "residual" clause). See id. at 2560, 2563; see also, e.g., United States v. Hurlburt, 835 F.3d 715, 725 (7th Cir. 2016) (collecting cases applying Johnson II to § 4B1.2(a)); United States v. Calabretta, 831 F.3d 128, 137–38 (3d Cir. 2016) (reaching same conclusion). But see Beckles v. United States, 616 F. App'x 415, 415–16 (11th Cir. 2015), cert. granted, 136 S. Ct. 2510 (2016) (holding Johnson II does not apply to crimes listed as crimes of violence in the commentary to § 4B1.2); United States v. Matchett, 802 F.3d 1185, 1196 (11th Cir. 2015) (holding that the sentencing guidelines cannot be unconstitutionally vague). We therefore

---

[4] Section 4B1.2(a)(2) was subsequently amended on July 13, 2016 to alter subsection (2). U.S.S.G. § 4B1.2(a)(2) (as amended July 13, 2016).

proceed to analyze whether the prior offenses at issue qualify as crimes of violence under subsection (1) of § 4B1.2(a), commonly referred to as the "force" clause.

**1. Resisting Arrest**

The Massachusetts offense of Resisting Arrest is defined as

> knowingly prevent[ing] or attempt[ing] to prevent a police officer, acting under color of his official authority, from effecting an arrest of the actor or another, by:
>
> (1) using or threatening to use physical force or violence against the police officer or another; or
>
> (2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another.

Mass. Gen. Laws ch. 268, § 32B(a).[5]

The parties agree that the version of this offense set forth in subsection (2) can no longer be considered to be a "crime of violence" under § 4B1.2(a)(2) of the Guidelines in the wake of Johnson II. The government argues, instead, that the version of Resisting Arrest described in subsection (1) is a crime of violence under the force clause according to our existing case law, United States v. Almenas, 553 F.3d 27, 32–33 (1st Cir. 2009), and that subsection (2) is divisible from subsection (1) within the meaning

---

[5] Tavares was convicted of resisting arrest in 2008. The statutory language has not changed since then.

- 18 -

of Descamps v. United States, 133 S. Ct. 2276, 2284 (2013). We should therefore remand this case, says the government, so that the district court may consider whether documents that the government supplies as permitted by Shepard v. United States, 544 U.S. 13, 26 (2005)[6] establish that the version of Resisting Arrest for which Tavares stood convicted was the subsection (1) version ("using or threatening to use physical force or violence against the police officer or another," Mass. Gen. Laws ch. 268, § 32B(a)(1)), rather than subsection (2).

Tavares does not dispute that the two versions of the Massachusetts Resisting Arrest offense set forth in subsections (1) and (2) are divisible under Descamps. Nor does Tavares disagree that remand for consideration of any Shepard documents would be appropriate if the subsection (1) version of the offense is a crime of violence. Instead, Tavares argues that the subsection (1) version of the Resisting Arrest offense itself fails to qualify categorically as a crime of violence.

In making this argument, Tavares correctly concedes that we have previously held precisely to the contrary; that is, that the subsection (1) version of the Massachusetts Resisting Arrest offense is a crime of violence under the force clause. See United

---

[6] Shepard documents include documents "from the convicting court, such as charging documents, plea agreements, plea colloquies, and jury instructions." United States v. Serrano-Mercado, 784 F.3d 838, 843 (1st Cir. 2015).

States v. Weekes, 611 F.3d 68, 72–73 (1st Cir. 2010), cert. denied 564 U.S. 1021 (2011); Almenas, 553 F.3d at 33. Tavares nevertheless points out that these prior opinions did not consider the impact of Johnson v. United States (Johnson I), 559 U.S. 133 (2010), which held that the term "physical force" under the force clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(i), requires "violent force," meaning "force capable of causing physical pain or injury to another person." Johnson I, 559 U.S. at 140. That holding, the parties do not dispute, also applies to the identical phrase at issue here under § 4B1.2 of the Guidelines. See, e.g., United States v. Castro-Vazquez, 802 F.3d 28, 37–38 (1st Cir. 2015); United States v. Carrigan, 724 F.3d 39, 50 (1st Cir. 2013). Because subsection (1) requires "physical force or violence," reasons Tavares, we should hold that it does not necessarily require "violent force," and hence the offense described in subsection (1) fails to qualify as a crime of violence under Johnson I.

Although we are generally bound by prior panel decisions on point, we may depart from circuit precedent if the prior holding

> is "contradicted by controlling authority, subsequently announced (say, a decision of the authoring court en banc, a Supreme Court opinion directly on point, or a legislative overruling)," or in "those relatively rare instances in which authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in

- 20 -

light of fresh developments, would change its
collective mind."

United States v. Pires, 642 F.3d 1, 9 (1st Cir. 2011) (citations
omitted). It is also true that we decided Almenas before Johnson
I construed "physical force" as used in the ACCA to require
"violent force." Almenas, however, did not rest on the assumption
that physical force meant something other than violent force. To
the contrary, in addressing the defendant's argument that some
conduct that fell under both subsections of the Resisting Arrest
statute was non-violent, we described that conduct (stiffening
one's arm to avoid being handcuffed) as something that could not
be characterized as "non-violent." Almenas, 553 F.3d at 35. No
controlling authority issued after Almenas and Weekes contradicts
our holdings in those cases. So Tavares must argue that post-
dated authority that is not directly controlling "nevertheless
offers a sound reason" for concluding that we would have reached
a different result had we known what we know now. Pires, 642 F.3d
at 9.

Tavares makes a plausible point that one might read
"physical force or violence" in the Resisting Arrest statute as
suggesting that "physical force" means something other than
violence. That point, though, was as valid when Almenas was
decided as it is today. Moreover, Johnson I itself construed the
term "physical force" as used in the ACCA to mean "violent force."
We also see nothing in the Massachusetts case law to which Tavares

points indicating that the element of "physical force or violence" is satisfied by a degree of physical force that would not equal or exceed the ACCA's "physical force." In Commonwealth v. Katykhin, 794 N.E.2d 1291 (Mass. App. Ct. 2003), the defendant refused to get into a police cruiser, stood "rigid, upright, almost like a plank of wood," and "began to pull away [from the police officer], starting a tug of war." Id. at 1292. In Commonwealth v. Joyce, 998 N.E.2d 1038 (Mass. App. Ct. 2013), the defendant was "shouting and struggling to pull his arms forward to maintain a fighting stance with [a third party]" while an officer placed him under arrest. Id. at 1044. He then refused to move his feet as two officers tried to bring him to the police cruiser "pushing backwards and straining to turn so that he could shout at bystanders." Id. at 1041, 1044. In Commonwealth v. Maylott, 841 N.E.2d 717 (Mass. App. Ct. 2006), the defendant was "moving his arms, flailing as he was yelling and screaming" when the officers tried to handcuff him. Id. at 718. When one officer took hold of his right hand, he stiffened his arm and refused to turn around or put his hands behind his back. Id.

It certainly seems reasonable to view the foregoing conduct as involving in each instance a use or threatened use of force sufficient to cause pain or injury so as to qualify under the force clause as construed in Johnson I. Whether we would so conclude in the absence of binding precedent, we need not decide.

Rather, we need only decide--and do decide--that this appeal does not present one of those rare occasions in which we might set aside controlling circuit precedent.

That leaves only the question whether the government should have the opportunity on remand to supplement the record with Shepard documents, assuming such documents exist and would pin Tavares's conviction firmly under Massachusetts Resisting Arrest subsection (1), rather than (2). Tavares does not argue that the government should not have such an opportunity. Here, importantly, the record was sufficient to sustain the government's position at the time of sentencing without any need to present Shepard documents, and we remand for reconsideration of that sentence only because the controlling law on the residual clause thereafter changed. Under such circumstances, supplementation of the record for sentencing on remand is appropriate.

**2. ABDW**

Chapter 265, § 15A(b) of Massachusetts General Laws sets forth the maximum term of incarceration and fine that may be imposed on a person "[w]ho[] commits an assault and battery upon another by means of a dangerous weapon." Mass. Gen. Laws ch. 265, § 15A(b).[7] The substantive definition of ABDW, in turn, is supplied by case law applying the crime's common law definition. See

_____

[7] Tavares was convicted of ABDW in 2009. The relevant portion of the statutory language has not changed since then.

- 23 -

Commonwealth v. Porro, 939 N.E.2d 1157, 1162 (Mass. 2010); Commonwealth v. Burno, 487 N.E.2d 1366, 1368-69 (Mass. 1986). In Burno, the Supreme Judicial Court of Massachusetts ("SJC") applied the common law definition of simple assault and battery to describe "two separate aspects to the crime" of ABDW. 487 N.E.2d at 1368. These "separate aspects" both require the use of a dangerous weapon and are described as follows:

> [(1)] "the intentional and unjustified use of force upon the person of another, however slight," or
>
> [(2)] the intentional commission of a wanton or reckless act . . . causing physical or bodily injury to another.

Id. at 1368-69 (citations omitted). For ease of reference given the numerous sections and subsections described in the opinion, we refer to these two forms of the offense as Massachusetts ABDW sections (1) and (2).

Tavares makes two principal arguments in challenging the district court's classification of this offense as a "crime of violence" under § 4B1.2(a)(1) of the Guidelines. Relying on this court's opinion in United States v. Fish, 758 F.3d 1 (1st Cir. 2014), he argues that ABDW under Massachusetts law is categorically not a "crime of violence" under § 4B1.2(a)(1) because (1) Massachusetts ABDW section (1)--"the intentional and unjustified use of force upon the person of another, however slight"--may be committed without employing the necessary "violent force" required

- 24 -

by Johnson I, and (2) Massachusetts ABDW section (2)--"the intentional commission of a wanton or reckless act . . . causing physical or bodily injury to another"--may be committed with a reckless, as opposed to an intentional, mens rea. Tavares also argues that, if he is correct that even one of these versions of ABDW does not qualify as a crime of violence, he must then prevail because Massachusetts ABDW is not elementally divisible into multiple offenses and thus is not subject to the modified categorical approach aimed at determining which version of the offense was the version for which he was previously convicted. See generally Descamps, 133 S. Ct. at 2281-82; United States v. Serrano-Mercado, 784 F.3d 838, 843 (1st Cir. 2015), petition for cert. docketed, No. 16-0237 (Aug. 24, 2016); accord Mathis v. United States, 136 S. Ct. 2243, 2248–49 (2016).

In Fish, we did indeed observe that the government, "with good reason," declined to argue that Massachusetts ABDW section (1) qualifies as a crime of violence under the force clause of 18 U.S.C. § 16(a), which is substantially identical to the force clause here, U.S.S.G. § 4B1.2(a)(1). Fish, 758 F.3d at 9. The reason, we observed, was that "ABDW may be accomplished by a mere 'touching, however slight,'" id. (quoting United States v. Hart, 674 F.3d 33, 42 (1st Cir. 2012)), and therefore did not involve the use of physical force, id.

Nevertheless, in United States v. Whindleton, 797 F.3d 105 (1st Cir. 2015), cert. dismissed, No. 15-9653, 2016 WL 3199031 (Aug. 19, 2016), and cert. denied, No. 16-5101, 2016 WL 3633306 (Oct. 3, 2016), the government advanced the argument it eschewed in Fish, and we turned our focus from the ACCA's "use . . . of physical force" to its "attempted . . . or threatened use of physical force" criterion, finding that a mere touching with a dangerous weapon constituted an attempted or threatened use of physical force. Id. at 113-16; see also United States v. Hudson, 823 F.3d 11, 16 (1st Cir. 2016) (reaffirming Whindleton). We have extended the holding in Whindleton from the force clause of the ACCA to the force clause of U.S.S.G. § 4B1.2(a). See United States v. Fields, 823 F.3d 20, 33-35 (1st Cir. 2016). Although Whindleton was convicted of assault with a dangerous weapon ("ADW"), Mass. Gen. Laws ch. 265, § 15B(b), rather than ABDW like Tavares, ADW is a "lesser included offense" of ABDW section (1). See Porro, 939 N.E.2d at 1165-66; Commonwealth v. Appleby, 402 N.E.2d 1051, 1059 (Mass. 1980). Therefore, no more "force"--whether attempted, threatened, or actually used--could be required for ADW than ABDW section (1). See United States v. Maxwell, 823 F.3d 1057, 1061 (7th Cir. 2016) (relying on level of force required by lesser-included offense to conclude that a prior state court conviction qualified under force clause of § 4B1.2(a)), cert. denied, No. 16-6072, 2016 WL 5357418 (Oct. 31, 2016). Thus, Whindleton's holding

means that ABDW section (1) qualifies as a crime of violence under the ACCA. Whindleton, 797 F.3d at 113-16. No decision since Whindleton calls that conclusion into question or suggests any reason why that conclusion should not apply equally to U.S.S.G. § 4B1.2(a)(1). For this reason, and tracking our holding in Whindleton rather than the government's concession in Fish, we hold that Massachusetts ABDW section (1)--"the intentional and unjustified use of force upon the person of another, however slight"--constitutes a crime of violence under § 4B1.2(a)(1) of the Guidelines. See Fields, 823 F.3d at 35 n.12 (not following as dicta Fish's observation about Massachusetts ABDW section (1)).

That holding leaves two questions: Is Massachusetts ABDW section (2)--"the intentional commission of a wanton or reckless act . . . causing physical or bodily injury to another" --also a crime of violence? If not, is Massachusetts' definition of ABDW divisible? We address the divisibility question first. Ultimately, we conclude that the statute is divisible and remand the case to the district court to determine whether Tavares was convicted under Massachusetts ABDW section (1) without deciding whether Massachusetts ABDW section (2) is also a crime of violence.

In Fish, this court posited that if Massachusetts had set forth the elements of each "aspect" of ABDW by statute, rather than in case law, it would read as follows:

> Assault and Battery with a Dangerous Weapon is:
>
> (1)  The intentional and unjustified touching of another by use of a dangerous weapon,
>
> or,
>
> (2)  The intentional commission of a wanton or reckless act [with a dangerous weapon] causing more than transient or trifling injury to another.

Fish, 758 F.3d at 15.  This offense reads as a divisible statute, one which "list[s] elements in the alternative, and thereby define[s] multiple crimes."  Mathis, 136 S. Ct. at 2249.  One set of elements requires a heightened mens rea--intentional conduct--but only slight contact.  Burno, 487 N.E.2d at 1368-69.  The other set requires merely reckless behavior but an injury that "interfered with the health or comfort of the victim."  Id. at 1370.  Which set of elements a jury would have to find in order to convict would depend upon which form of ABDW the government advanced at trial.

Tavares, however, points us to decisions from the state's intermediate appellate court--the Appeals Court of Massachusetts--which hold that jurors need not be unanimous as to the form of assault and battery of which it convicts a defendant.  See Commonwealth v. Mistretta, 995 N.E.2d 814, 815-16 (Mass. App. Ct.) (per curiam), rev. denied, 996 N.E.2d 881 (Mass. 2013); see also Commonwealth v. Frith, No. 15-P-0364, 2016 WL 3659906, at *2

- 28 -

(Mass. App. Ct. July 8, 2016) (unpublished opinion).  In Mistretta,
the court found that the two forms of assault and battery "are
closely related subcategories of the same crime," and thus
"[s]pecific unanimity is not required, because they are not
'separate, distinct, and essentially unrelated ways in which the
same crime can be committed.'"  995 N.E.2d at 815–16 (quoting
Commonwealth v. Santos, 797 N.E.2d 1191, 1197 (Mass. 2003),
overruled on other grounds by Commonwealth v. Anderson, 963 N.E.2d
704, 718 (Mass. 2012)).  Based on Mistretta, the 2016 version of
the Criminal Model Jury Instructions for Assault and Battery, while
laying out the elements for both "Intentional Assault and Battery"
and "Reckless Assault and Battery," instruct that "[n]o verdict
slip or specific unanimity instruction [is] required where both
intentional and reckless assault and battery are alleged."
Massachusetts Criminal Model Jury Instructions for Use in the
District Court, Instruction 6.140, at 6 n.1 (June 2016), available
at                       http://www.mass.gov/courts/docs/courts-and-
judges/courts/district-court/jury-instructions-criminal/6000-
9999/6140-assault-and-battery.pdf.[8]

---

[8] We note, however, that the model jury instructions for ABDW still
state that "[i]f both the intentional and reckless theories of
culpability are submitted to the jury, the judge must provide the
jury with a verdict slip to indicate the theory or theories on
which the jury bases its verdict and is required, on request, to
instruct the jurors that they must agree unanimously on the theory
of culpability."  Massachusetts Criminal Model Jury Instructions
for Use in the District Court, Instruction 6.300, at 6 (2009 ed.),

We are not bound by a decision of a state intermediate appellate court, though such a decision "generally constitutes a reliable piece of evidence" concerning a state-law question. Noviello v. City of Boston, 398 F.3d 76, 91 (1st Cir. 2005). Where, as here, the state's highest court--the SJC--"has not spoken directly to an issue, [we] must make an informed prophecy as to the state court's likely stance." Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008).

We first consider whether Mistretta's holding is relevant to the divisibility inquiry before deciding whether it accurately reflects Massachusetts state law. The precise question before us is whether the differing items involved in committing each form of the offense--intentional versus reckless mens rea; slight contact versus bodily injury--"merely specif[y] diverse means of satisfying a single element of a single crime," or constitute "elements in the alternative, . . . thereby defin[ing] multiple crimes." Mathis, 136 S. Ct. at 2249. Whether Massachusetts requires that jurors unanimously agree on the form of ABDW under which they are convicting a defendant informs this analysis because the Supreme Court and this court have repeatedly stated that jurors must unanimously find that the government proved

available at http://www.mass.gov/courts/docs/courts-and-judges/courts/district-court/jury-instructions-criminal/6000-9999/6300-assault-and-battery-by-means-of-a-dangerous-weapon.pdf.

- 30 -

all "elements" of an offense beyond a reasonable doubt to convict a defendant. See id. at 2248 ("[Elements] are what the jury must find beyond a reasonable doubt to convict the defendant . . . . Facts, by contrast, are mere real-world things--extraneous to the crime's legal requirements."); Descamps, 133 S. Ct. at 2288 ("The Sixth Amendment contemplates that a jury . . . will find [] facts [about the defendant's conduct] unanimously and beyond a reasonable doubt. And the only facts the court can be sure the jury so found are those constituting elements of the offense . . . ."); id. at 2298 (Alito, J., dissenting) ("The feature that distinguishes elements and means is the need for juror agreement . . . ."); Richardson v. United States, 526 U.S. 813, 817 (1999); Schad v. Arizona, 501 U.S. 624, 636 (1991) (plurality opinion); United States v. LaPlante, 714 F.3d 641, 647 (1st Cir. 2013).

State law as to what facts a jury must agree upon unanimously plays a crucial role in distinguishing between elements and mere factual means.[9] See Mathis, 136 S. Ct. at 2250 ("[The locations listed in the Iowa burglary statute] lay out alternative ways of satisfying a single locational element, as the Iowa Supreme Court has held: Each of the terms serves as an 'alternative method of committing [the] single crime' of burglary,

---

[9] Before Mathis, the circuits were split on this question. See Almanza-Arenas v. Lynch, 815 F.3d 469, 479–81 (9th Cir. 2016) (en banc) (recognizing circuit split).

so that a jury need not agree on which of the locations was actually involved." (quoting State v. Duncan, 312 N.W.2d 519, 523 (Iowa 1981))). Thus, if Mistretta accurately reflects Massachusetts state law, it means that Massachusetts ABDW is indivisible.

We must therefore predict how the SJC would decide whether a specific unanimity instruction is required in an ABDW prosecution, using Mistretta as a reliable piece of evidence. Mistretta applied the standard set forth by the SJC in Santos for determining when jury unanimity is required. In Santos, the defendant claimed that the trial judge had erred by refusing to give a specific unanimity instruction with respect to the indictment charging armed robbery. 797 N.E.2d at 1194. He argued that whether he had used force on the victim or had merely placed the victim in fear constituted different "theories" of the assault element of armed robbery, thus requiring specific unanimity. Id. at 1196. The SJC disagreed and held that a specific unanimity instruction was not required. Id. at 1198.

Santos reached this holding on the basis of three intermediate conclusions. First, a specific unanimity instruction is only required when there is more than one "theory" of guilt for a charged crime, and the alternative "theories" are "substantively distinct or dissimilar." Santos, 797 N.E.2d at 1197-98. Second, two "alternate method[s] by which a single element may be established" that are "closely related" are not substantively

- 32 -

distinct or dissimilar. Id. Third, "actual force" and "threat of force" are closely related factual means of satisfying a single element. Id. at 1198. The second and third conclusions indicate that actual force and threat of force are not substantively distinct or dissimilar. Thus, by the first conclusion, a specific unanimity instruction was not required.

Dictum in the Santos opinion clarifies that, in determining whether two forms of an offense are "substantively distinct or dissimilar" theories or "closely related" methods of proving the same elements, courts should consider the mens rea requirements of the two forms of the offense. The SJC offered manslaughter as an example of a crime that may be proved by two different theories that are "substantively distinct or dissimilar"--namely, voluntary manslaughter and involuntary manslaughter. Id. at 1197. Under Massachusetts law, "voluntary manslaughter is an intentional killing, which is mitigated by extenuating circumstances,'" Commonwealth v. Squailia, 706 N.E.2d 636, 642 (Mass. 1999) (emphasis omitted), while "[i]nvoluntary manslaughter is an unintentional, unlawful killing caused by wanton or reckless conduct," Commonwealth v. Earle, 937 N.E.2d 42, 48 (Mass. 2010). The Santos opinion concluded that voluntary and involuntary manslaughter were not closely related because of their different mens rea requirements. 797 N.E.2d at 1197 ("[V]oluntary and involuntary manslaughter are mutually exclusive--one cannot

kill both intentionally and unintentionally at the same time."). This conclusion could apply equally to Massachusetts ABDW section (1) and Massachusetts ABDW section (2), which, like the two forms of manslaughter, differ in that one requires intent while the other requires recklessness. Thus, this dictum from Santos indicates that Mistretta was wrongly decided.

Mistretta, however, also drew support from a later SJC opinion, Porro, 939 N.E.2d 1157, which complicates the analysis. Porro addressed the relationship between two different types of assault: attempted battery assault and threatened battery assault. The court held that "[a]n assault under a theory of attempted battery . . . has elements different from an assault under a theory of threatened battery." Id. at 1163. The elements of attempted battery assault are that "the defendant 'intended to commit a battery, took some overt step toward accomplishing that intended battery, and came reasonably close to doing so.'" Id. (citation omitted). The elements of threatened battery assault are "that the defendant engaged in conduct that a reasonable person would recognize to be threatening, that the defendant intended to place the victim in fear of an imminent battery, and that the victim perceived the threat." Id.

Although these two forms of assault have different elements, Porro contains a statement (itself also dictum) that a specific unanimity instruction is not required in prosecutions for

assault.  Id. at 1165-66.  This statement, if adopted, would extend

Santos's holding as to the assault element of robbery to the

substantive crime of assault:

> Because attempted battery and threatened
> battery "are closely related," we do not
> require that a jury be unanimous as to which
> theory of assault forms the basis for their
> verdict; a jury may find a defendant guilty of
> assault if some jurors find the defendant
> committed an attempted battery (because they
> are convinced the defendant intended to strike
> the victim and missed) and the remainder find
> that he committed a threatened battery
> (because they are convinced that the defendant
> intended to frighten the victim by threatening
> an assault).

Porro, 939 N.E.2d at 1165 (quoting Santos, 797 N.E.2d at 1197);

see also Commonwealth v. Arias, 939 N.E.2d 1169, 1173-74, 1173 n.2

(Mass. App. Ct. 2010).

Porro's dictum is in tension with United States Supreme

Court precedent.  Under a literal reading, Porro states that the

two forms of assault have different elements and that a jury may

convict a defendant of assault without agreeing unanimously about

which elements of the crime were satisfied.  Such a holding would

contradict the definition of "element" as it is used by the Supreme

Court.  See, e.g., Mathis, 136 S. Ct. at 2250.  While we could

reject the SJC's conclusion about the specific unanimity

requirement for assault as dictum, we note that it has been

incorporated into the model jury instructions for assault.  See

Massachusetts Criminal Model Jury Instructions for Use in the

- 35 -

District Court, Instruction 6.120, at 4 n.9 (2009 ed.), available at http://www.mass.gov/courts/docs/courts-and-judges/courts/district-court/jury-instructions-criminal/6000-9999/6120-assault.pdf. Thus, we conclude that the Porro opinion uses the word "element" differently than the Supreme Court. Under the Supreme Court's usage, Porro's dictum that a specific unanimity instruction is not required in prosecutions for assault implies that the two forms of assault are alternative means of proving the same elements.[10]

Porro is also in tension with the dictum from Santos from which we concluded that Mistretta was wrongly decided. Like the example of voluntary and involuntary manslaughter, the two forms of assault considered in Porro have different mens rea requirements. Attempted battery requires an intent to commit a battery, while threatened battery requires an intent to place the victim in fear of an imminent battery. Porro, 939 N.E.2d at 1163. These two mens rea requirements are more closely related than intent and recklessness, however. While "one cannot kill both intentionally and unintentionally at the same time," Santos, 797 N.E.2d at 1197, one could easily intend both to commit a battery

---

[10] This interpretation of Porro is consistent with the central holding of that opinion, which is that both forms of assault are generally lesser included offenses of assault and battery, even though the "elements" of assault and battery and threatened battery do not overlap in the way that is usually required. See Porro, 939 N.E.2d at 1165.

- 36 -

and to place a victim in fear of an imminent battery.  Therefore, Porro does not alter the conclusion we reached above.  We predict that the SJC would not follow Mistretta.

This conclusion is compatible with the language the United States Supreme Court has used to distinguish elements from mere facts.  Whether one commits ABDW with an intentional or reckless mens rea carries with it an important legal consequence: it changes the required result of the battery needed for a conviction.  If the actor intentionally uses force upon another, no injury must be proven, but if the actor intends only to commit conduct that is reckless, physical or bodily injury must be proven. Burno, 487 N.E.2d at 1368-69.  The differences in the two forms of Massachusetts ABDW--intentional versus reckless mens rea, slight touching versus bodily injury--are substantively distinct and therefore constitute alternative elements, rather than different factual means of establishing a single set of elements.  See Mathis, 136 S Ct. at 2248 ("Facts . . . . are 'circumstance[s]' or 'event[s]' having no 'legal effect [or] consequence.'" (quoting Black's Law Dictionary 709 (10th ed. 2014))).  Accordingly, we find that the crime of Massachusetts ABDW is divisible.

Of course, given our finding that Massachusetts ABDW section (1) is a crime of violence, our conclusion that ABDW is divisible only makes a difference if Massachusetts ABDW section (2)--the reckless version of ABDW--is not a crime of

violence. Prior to the Supreme Court's recent decision in Voisine

v. United States, 136 S. Ct. 2272 (2016), precedent directly

dictated that the reckless, unintentional causing of injury, such

as unintentionally hitting a pedestrian while driving recklessly,

was not a crime of violence under 18 U.S.C. § 16(b).[11]  See Fish,

758 F.3d at 10-14. Our holding in Fish was based on the reasoning

of Leocal v. Ashcroft, 543 U.S. 1 (2004), which interpreted the

phrase "use . . . physical force against the person or property of

another" to require "active employment."  543 U.S. at 9; see also

Fish, 758 F.3d at 9-10. Such reasoning would seem to apply equally

to the pertinent Guidelines definition of a crime of violence at

issue here. Thus, Fish would dictate that a conviction for the

reckless version of ABDW is not a crime of violence under U.S.S.G.

§ 4B1.2(a)(1). Voisine, though, calls into question the continuing

validity of Fish, as well as the similar and analogous holdings of

at least ten other circuits. See Fish, 758 F.3d at 9-10, 10 n.4

(listing cases).

In Voisine, the Supreme Court held that 18 U.S.C.

§ 922(g)(9)'s prohibition against gun possession for persons

convicted "of a misdemeanor crime of violence" extended to persons

---

[11] Section 16(b) provides that "any . . . offense that is a felony
and that, by its nature, involves a substantial risk that physical
force against the person or property of another may be used in the
course of committing the offense" is a crime of violence.  18
U.S.C. § 16(b).

convicted of such an offense even under a reckless theory of mens rea. 136 S. Ct. at 2282. It reasoned that the word "use" in 18 U.S.C. § 921(a)(33)(A), which defines the term "misdemeanor crime of domestic violence" as including a misdemeanor that "has, as an element, the use or attempted use of physical force," encompasses "an act of force carried out in conscious disregard of its substantial risk of causing harm," i.e., reckless conduct. 136 S. Ct. at 2279. The government contends that this reasoning applies equally in interpreting the word "use" in § 4B1.2(a)(1) of the Guidelines.

That this contention is correct, however, is not entirely clear. As Tavares points out, Voisine itself specifically left open the question whether reckless conduct is encompassed in the similar statutory language found in 18 U.S.C. § 16. See Voisine, 136 S. Ct. at 2280 n.4. And in reaching its conclusion, the Court also relied upon the history and purpose of § 922(g)(9), explaining that a contrary finding "would have undermined Congress's aim," id. at 2281, to prohibit domestic abusers from possessing firearms in light of the fact that "a significant majority of jurisdictions . . . defined such misdemeanor offenses to include the reckless infliction of bodily harm," id. at 2280. Indeed, Voisine recognizes in a footnote that "[c]ourts have sometimes given [§ 921(a)(33)(A) and § 16] divergent readings in light of differences in their contexts and purposes, and we do not

- 39 -

foreclose that possibility with respect to their required mental states." Id. at 2280 n.4. Further muddying the waters is the different statutory language used in each statute: § 921(a)(33)(A) refers only to the "use of physical force," 18 U.S.C. § 921(a)(33)(A)(ii), whereas § 4B1.2(a)(1) of the Guidelines refers to the "use of physical force against the person of another," U.S.S.G. § 4B1.2(a)(1) (emphasis added). See Leocal, 543 U.S. at 9 ("Whether or not the word 'use' alone supplies a mens rea element, the parties' primary focus on that word is too narrow . . . . The critical aspect of § 16(a) [in determining that it excludes negligent or accidental conduct] is that a crime of violence is one involving the 'use . . . of physical force against the person or property of another.'"). But see Voisine, 136 S. Ct. at 2279 (stating that the quoted reasoning from Leocal "fully accords with our analysis here").

Even a careful reader of this opinion may at this point feel lost. We began with a seemingly simple question. Has Tavares been convicted of a crime of violence? Trying to answer that question then led us down several rabbit holes: Is Massachusetts ABDW a divisible offense under Descamps and Mathis? How does Massachusetts law define the relationship between the two common forms of the offense? Does Voisine upend the circuits' wide consensus that recklessly causing injury is different than using force against a person?

- 40 -

In a sensible world, Congress and/or the Sentencing Commission would have made a list of state and federal laws deemed to be crimes of violence that warranted the desired penalties and sentencing enhancements. At its margins, such a list might be over- or under-broad. It would, though, be straightforward.

Instead of using a simple list, the drafters adopted abstract descriptions of the crimes that would appear on such a list, employing terms such as "physical force," "use," "injury," and so on. The result is a Rube Goldberg jurisprudence of abstractions piled on top of one another in a manner that renders doubtful anyone's confidence in predicting what will pop out at the end. Cf. Almanza-Arenas v. Lynch, 815 F.3d 469, 483–84 (9th Cir. 2015) (en banc) (Owens, J., concurring).

What pops out matters a great deal. In Fish, one could not know whether certain conduct was lawful or criminal unless one knew whether a prior crime was a crime of violence. Here, Tavares could not know--within years--the guidance applicable to his sentencing. Nor could one get confident answers by asking a lawyer--or even a judge. So what do we do here? For three reasons, we stop short of finally deciding now whether a conviction under the reckless version of ABDW qualifies as a crime of violence.

First, the Supreme Court has granted certiorari in Beckles v. United States, 616 F. App'x 415 (11th Cir. 2015), cert. granted, 136 S. Ct. 2510 (2016). Although the Eleventh Circuit

- 41 -

decided that case on the narrow ground that Johnson II did not apply to a career offender enhancement based on the Guidelines commentary to § 4B1.2, id. at 415-16, the petition for certiorari raised the much broader question as to whether Johnson II applies to the residual clause of § 4B1.2(a)(2). See Petition for Writ of Certiorari at i, Beckles v. United States, No. 15-8544 (U.S. Mar. 9, 2016), 2016 WL 3476563. The Supreme Court granted the petition in full, 136 S. Ct. 2510, 2510, and thus may well answer this broader question. If the Court decides that Johnson II does not so apply, then the district court may consider if it can once again rely on the residual clause or if the government has forfeited any reliance on that clause by conceding the issue on appeal.

Second, even if Beckles does not put the residual clause back in play in this case, it will only be necessary to decide whether the reckless version of ABDW is a crime of violence if there are no Shepard documents that make clear that Tavares's ABDW conviction was for the intentional version of the offense. As Tavares noted in his supplemental brief, the Massachusetts district court criminal model jury instructions, at least prior to this year, instructed Massachusetts courts to use a jury verdict form for ABDW charges that would plainly reveal which version of the offense was the offense of conviction.[12] Common sense suggests,

_____

[12] They may still do so for ABDW, though not for assault and battery. See note 8, supra.

too, that by far the most common version of the offense charged is the intentional version. In sum, whether the reckless version of ABDW is also a crime of violence will likely not make any difference in this case.

Third, in the event that it does make a difference, the parties will be able to brief the issue and the district court--for the first time--will be able to consider it. We, in turn, will then have the benefit of a fully developed record, the district court's views, and likely more precedent to consider as we and other courts encounter the "recklessness" question in other cases in which the answer does make a difference. We therefore remand to the district court to allow the government the opportunity to put forth Shepard documents that clarify whether Tavares's ABDW conviction was for the intentional or reckless version of the offense.

## CONCLUSION

We affirm Tavares's conviction, but remand for reconsideration of his sentence consistent with this opinion. If the district court concludes that either the Resisting Arrest conviction or the ABDW conviction did not qualify under the career offender guideline, it should vacate and resentence. Otherwise, it should vacate and then re-enter the present sentence.